UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THOMAS E. WARD, II; MELVIN E.
WATSON; and ROBERT MATHIS,

                              Plaintiffs,

           v.

RICHARD SHADDOCK and the NEW
YORK STATE DEPARTMENT OF
TRANSPORTATION,

                              Defendants.

Case No. 14-CV-7660 (KMK)

OPINION & ORDER

Appearances:

James E. Monroe, Esq.
Dupee, Dupee & Monroe, P.C.
Goshen, NY
*Counsel for Plaintiffs*

John P. Meenagh, Jr., Esq.
Kelly & Meenagh
Poughkeepsie, NY
*Counsel for Defendant Richard Shaddock*

William J. Taylor, Jr., Esq.
Office of the Attorney General for New York State
New York, NY
*Counsel for Defendant New York State Department of Transportation*

KENNETH M. KARAS, District Judge:

Thomas E. Ward, III ("Ward"), Melvin E. Watson ("Watson"), and Robert Mathis

("Mathis") (collectively, "Plaintiffs") bring this Action against Richard Shaddock ("Shaddock")

and the New York State Department of Transportation ("DOT") (collectively, "Defendants"),

alleging discrimination, hostile work environment, and retaliation pursuant to 42 U.S.C. § 1983

and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*.  Before the

Court are two Motions To Dismiss Plaintiffs' Amended Complaint, one on behalf of Shaddock ("Shaddock's Motion"), and one on behalf of DOT ("DOT's Motion"). For the following reasons, Shaddock's Motion is granted in part and denied in part, and DOT's Motion is granted.

## I. Background

### A. Factual Background

The following facts are drawn from Plaintiffs' Amended Complaint and are taken as true for the purpose of resolving the instant Motions.

#### 1. The Parties

Ward, Watson, and Mathis are African-American DOT employees who currently work at the DOT facility in Monticello, New York ("Monticello facility"). (Am. Compl. ¶¶ 1–3 (Dkt. No. 28).) Ward has worked for DOT since 1999 and, at all times relevant to this Action, has served as a Highway Maintenance Supervisor I at the Monticello facility. (*Id.* ¶ 1.) He also serves as Watson's and Mathis' direct supervisor. (*Id.* ¶ 27.) Watson has worked for DOT since 1988 and serves as a Highway Maintenance Worker II at the Monticello facility, a position he has held at all times relevant to this Action. (*Id.* ¶ 2.) Mathis has worked for DOT since 2003 and, at all times relevant to this Action, was, and continues to be, a Highway Maintenance Worker I at the Monticello facility. (*Id.* ¶ 3.)

DOT is an agency of the State of New York. (*Id.* ¶ 4.) DOT's personnel equipment is divided into separate regions. (*Id.* ¶ 13.) Each region is further divided into local residencies and substations. (*Id.*) Region 9, Residency 9-7, to which Plaintiffs were assigned, is comprised of three substations located in Monticello, Liberty, and Kenoza Lake. (*Id.* ¶ 14.)

Shaddock is a DOT employee. (*Id.* ¶ 5.) From approximately 2006 to October 2014, he served as Residency 9-7's Highway Maintenance Supervisor II in Monticello. (*Id.* ¶¶ 5–6, 11.)

In that role, he was responsible for "day-to-day work assignments and allocation of equipment" at the Monticello facility, in addition to the "pre-screening" of all applicants for employment in the region.  (*Id.* ¶ 5.)  As a product of a disciplinary proceeding brought by DOT, Shaddock was relieved as Highway Maintenance Supervisor II at the Monticello facility on or about October 23, 2014, and transferred to the facility in Kenoza Lake.  (*Id.* ¶ 6; *see also id.* ¶ 11 (alleging that Shaddock was relieved "for failing to promote a positive and productive work place policy").)

### 2.  Allegations of Discrimination and Hostile Work Environment

During his tenure as Residency 9-7's Highway Maintenance Supervisor II, Shaddock "regularly expressed contempt for African-Americans"—both generally and those workers under his supervision, which included Plaintiffs—"by describing them as, among other things, dirt chickens, coons, niggers, lazy, stupid[,] and unqualified because of their race."  (*Id.* ¶ 15.)  He "also regularly made racially charged jokes and references about the African-American workers under his command in the presence of an exclusively white audience."  (*Id.* ¶ 16.)  In addition, Shaddock "permitted, condoned[,] and acquiesced in racially discriminatory conduct committed by Caucasian subordinates[,] which included racially defamatory language, racially demeaning use of caricatures and cartoons[,] and a general disrespect and animus for African-Americans including but not limited to [Plaintiffs]."  (*Id.*)  This conduct also encompassed "acts of vandalism perpetrated against Ward's office, desk[,] and business records," which were intended to "diminish and undermin[e] Ward's authority to supervis[e] his Caucasian subordinates."  (*Id.* ¶ 17.)

Additionally, Shaddock pre-screened Residency 9-7's job applications in a racially discriminatory fashion.  (*Id.* ¶ 18.)  "As a result, less than five percent of Residency 9-7's work force is comprised of minority workers," (*id.*), and he "eliminated the possibility of full-time

employment for any new minority applicant," (*id.* ¶ 19).  As one example, Shaddock passed over several well-qualified African-American applicants to instead hire two Caucasian males who lacked the same experience and qualifications.  (*Id.*)  He also "discard[ed] and/or conceal[ed] applications submitted by qualified African-American applicants."  (*Id.*)  No African-American has been hired for a full-time position at the Monticello facility since 2003, three years prior to Shaddock's tenure as Highway Maintenance Supervisor II.  (*Id.*)

Each year, DOT hires seasonal workers for the winter months, and qualified applicants from this group typically are offered full-time positions within Residency 9-7, based upon their performance.  (*Id.* ¶ 20.)  During the years immediately preceding this Action, "Shaddock purposely denied full-time employment to African-American seasonal workers whose experience and qualifications were superior to their less experienced Caucasian counterparts."  (*Id.*)  Since 2006, 11 seasonal workers have been hired for permanent positions at the Monticello facility, all of whom are Caucasian.  (*Id.*)  Moreover, of the 14 seasonal workers hired in Residency 9-7 for the 2013 and 2014 calendar years, only two were African-American.  (*Id.* ¶ 21.)

From approximately 2011 through 2014, of the five African-American men assigned to the Monticello facility, four—including Plaintiffs—"have been assigned to the less desirable evening shift."  (*Id.* ¶ 22.)  Ward is the only minority Highway Maintenance Supervisor I within Residency 9-7 and directly supervises the 13 men assigned to the evening shift.  (*Id.* ¶ 23.) "Shaddock relegated nearly all [the] minority employees to the evening shift under Ward's supervision."  (*Id.*)  As of 2013, the only minority seasonal worker to be hired at the Monticello facility was assigned to the evening shift.  (*Id.* ¶ 24.)  Only one full-time minority worker at the Monticello facility is assigned to the day shift during the winter months.  (*Id.*)

4

### 3.  Allegations of Retaliation

"On or about May 6, 2013[,] Ward filed an internal complaint with DOT's Diversity Management Bureau[,] claiming discrimination based on race, retaliation[,] and color."  (*Id.* ¶ 25.)  The "complaint specifically addressed acts of racial discrimination directed towards himself, Watson, Mathis[,] and other African-Americans employed by . . . DOT."  (*Id.* ¶ 26.) "Watson and Mathis [had] complained to Ward about acts of racial discrimination perpetrated against them by Shaddock and other Caucasian co-workers," (*id.* ¶ 27), and Ward's complaint incorporated those allegations, (*id.* ¶ 28).

Subsequently, Ward's office, equipment, and personal desk were vandalized, leading to the destruction of his personal and business records.  (*Id.* ¶ 29.)  "[F]ollowing May 6, 2013[,] Shaddock [not only] reassigned Ward from the newest truck in the fleet to either the oldest truck . . . or the garbage truck . . . or no vehicle at all," (*id.* ¶ 33; *see also id.* Ex. B), but "also reassigned Watson and Mathis to the oldest equipment in DOT's fleet" as punishment for the filing of the internal complaint, (Am. Compl. ¶ 34).  Also "on or after May 6, 2013," Shaddock reassigned Plaintiffs "to perform menial tasks[,] such as collecting litter and dead animal carcasses[,] at a much greater frequency than the[ir] Caucasian counterparts" and despite the fact that such assignments were normally given to employees with less experience than Plaintiffs. (*Id.* ¶ 35.)[1]  To further punish Plaintiffs for filing the internal complaint, "Shaddock refused to directly communicate or acknowledge [them]," (*id.* ¶ 37), "intentionally promoted a racially hostile environment," (*id.*), imposed "a heightened degree of scrutiny" on Plaintiffs' work

---

[1] By way of example, during the non-winter months of 2012, Shaddock never assigned Ward to perform these menial tasks, but during the non-winter months of 2013, Shaddock directed Ward to collect litter and carcasses on 34 separate occasions in order to "punish Ward for having complained to . . . DOT's Diversity Management Bureau about [racial discrimination]."  (Am. Compl. ¶ 36; *see also id.* Ex. C.)

performance, (*id.* ¶ 38), and filed false reports regarding Plaintiffs' work performance, (*id.* ¶ 39).

"[O]n or after May 6, 2013," he also "intentionally deprived Ward of necessary safety

equipment," (*id.* ¶ 40), and "substantially reduced the number of men under Ward's

supervision," (*id.* ¶ 41; *see also id.* Ex. D).

As a result of these acts undertaken by Shaddock in his capacity as a final policymaker

for DOT, (Am. Compl. ¶ 45), and "motivated by racial animus and/or in retaliation for

[P]laintiffs' complaints of racial discrimination," (*id.* ¶ 44)," Ward, Watson, and Mathis

"suffered humiliation, indignity[,] and degradation on account of their race," (*id.* ¶ 47).

B.  Procedural History

Ward received his Notice of Right to Sue from the Equal Employment Opportunity

Commission on June 25, 2014.  (*Id.* ¶ 12; *see also id.* Ex. A.)  On September 22, 2014, Ward

timely commenced the instant Action against DOT and Shaddock, alleging discrimination,

hostile work environment, and retaliation under Title VII, § 1983, and § 1985.  (Dkt. No. 1.)  On

February 4, 2015, by stipulation of the Parties, the Court dismissed with prejudice all of Ward's

claims against Shaddock as well as his non-Title VII claims against DOT.  (Dkt. No. 23.)

On March 18, 2015, Plaintiffs filed their Amended Complaint against DOT and

Shaddock, raising claims for employment discrimination, hostile work environment, and

retaliation.  (Dkt. No. 28.)[2]  On September 1, 2015, by stipulation of the Parties, the Court

dismissed with prejudice all claims alleged by Watson and Mathis against DOT as well as any

claims against Shaddock in his official capacity.  (Dkt. No. 45.)

---

[2] Although the Amended Complaint purports to bring this Action pursuant to 42 U.S.C.
§ 1985 as well, (*see* Am. Compl. ¶¶ 8, 49), Plaintiffs have withdrawn this claim, (*see* Pls.' Opp'n
to Defs.' Mot. ("Pls.' Opp'n") 9 (Dkt. No. 57)).

Pursuant to a Scheduling Order adopted by the Court on July 9, 2015, (Dkt. No. 43), DOT filed its Motion To Dismiss and supporting papers on September 4, 2015, (Dkt. Nos. 46–48), and Shaddock filed his Motion To Dismiss and supporting papers the same day, (Dkt. Nos. 49, 53–54). Plaintiffs submitted their opposition papers on October 30, 2015. (Dkt. Nos. 56–57.) Shaddock submitted his reply on December 4, 2015, (Dkt. Nos. 58–59), as did DOT, (Dkt. No. 61).

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alterations, citations, and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks and alterations omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief

will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 176 (2d Cir. 2013) (explaining that a court "reviewing a dismissal pursuant to Rule 12(b)(6)" must "accept all factual allegations in the complaint as true" (alteration and internal quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the [c]ourt . . . draw[s] all reasonable inferences in favor of the plaintiff."  *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

Lastly, a court ruling on a Rule 12(b)(6) motion "may consider the complaint[,] . . . any written instrument attached to the complaint as an exhibit[,] or any statements or documents incorporated in it by reference," as well as "matters of which judicial notice may be taken, and documents either in [the] plaintiffs' possession or of which [the] plaintiffs had knowledge and relied on in bringing suit."  *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014) (alterations and internal quotation marks omitted), *cert denied*, 135 S. Ct. 677 (2014); *see also Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107

(2d Cir. 1999) ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." (internal quotation marks omitted)).

B.  Analysis

Ward brings claims against DOT under Title VII, alleging employment discrimination, hostile work environment, and retaliation.  (*See* Am. Compl. ¶¶ 7, 50.)  Watson and Mathis bring claims under § 1983 against Shaddock for subjecting them to a racially hostile work environment and for retaliating against them when they complained of the hostile work environment.  (*See id.* ¶¶ 8, 49.)  Plaintiffs seek compensatory damages against DOT and Shaddock.  (*Id.* ¶¶ 51–52.) Watson and Mathis also seek punitive damages against Shaddock, individually.  (*Id.* ¶ 51.)

1.  Discrimination Claim Against DOT

As against DOT, Ward first alleges unlawful discrimination on the basis of his race.  (*Id.* ¶¶ 7, 50.)  DOT responds that the Amended Complaint fails to plausibly allege "that Ward suffered an adverse employment action or that any adverse employment action was motivated by discriminatory intent."  (DOT's Mem. of Law in Supp. of Mot. ("DOT's Mem.") 9 (Dkt. No. 47) (internal quotation marks omitted).)

To establish a prima facie case of discrimination under Title VII, a plaintiff must show that:  "1) he belonged to a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003).  A plaintiff "alleging employment discrimination need not plead a prima facie case" in order "[t]o survive a motion to dismiss."  *Henry v. N.Y.C. Health & Hosp. Corp.*, 18 F. Supp.

3d 396, 404 (S.D.N.Y. 2014) (italics and internal quotation marks omitted).  However, "the elements of a prima facie case provide an outline of what is necessary to render [such] claims for relief plausible."  *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 461 (S.D.N.Y. 2013) (italics and internal quotation marks omitted).  Courts accordingly "consider these elements in determining whether there is sufficient factual matter in the complaint which, if true, gives . . . fair notice of [a plaintiff's] claim and the grounds on which it rests."  *Henry*, 18 F. Supp. 3d at 404 (internal quotation marks omitted).

Here, there is no dispute as to the first two elements of the prima facie case:  Ward, as an African-American, is a member of a protected class, and he was qualified for his position with DOT.  (*See generally* DOT's Mem. 9–13.)  The Court, therefore, turns to the question of adverse employment action.

To constitute an adverse employment action in the context of a discrimination claim, there must be "a materially adverse change in the terms and conditions of employment." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (emphasis and internal quotation marks omitted).  This requires "a change in working conditions . . . more disruptive than a mere inconvenience or an alteration of job responsibilities," such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  *Id.*

As clarified in Plaintiffs' opposition papers, Ward allegedly suffered an adverse employment action in that he was "given tasks and assignments that were not commensurate with [his] status [as a] long[-]term DOT employee[]."  (Pls.' Opp'n to Defs.' Mot. ("Pls.' Opp'n") 12 (Dkt. No. 57).)  Under certain circumstances, the receipt of undesirable assignments

may rise to the level of an adverse employment action.  *See, e.g.*, *Feingold v. New York*, 366 F.3d 138, 152–53 (2d Cir. 2004) (concluding that the plaintiff's receipt of a "disproportionately heavy workload" constituted a materially adverse employment action).  However, "the receipt of undesirable assignments must be accompanied by a material detriment to an employee's working conditions to constitute an adverse employment action."  *Henry*, 18 F. Supp. 3d at 406.  In this case, the Amended Complaint alleges:  (i) Ward was "assigned to the less desirable evening shift" between 2011 and 2014, (Am. Compl. ¶ 22); (ii) Ward was reassigned from "a supervisor's truck . . . to either the oldest truck . . . or the garbage truck . . . or no vehicle at all," (*id.* ¶ 33); (iii) Shaddock assigned Ward "to perform menial tasks . . . normally given to lower-grade employees," (*id.* ¶ 35); and (iv) Shaddock "substantially reduced the number of men under Ward's supervision," (*id.* ¶ 41).[3]  These allegations, without more, amount only to a "mere inconvenience," rather than a "materially adverse change in the terms and conditions of employment."  *Henry*, 18 F. Supp. 3d at 404 (internal quotation marks omitted); *see also Johnson v. Morrison & Foerster LLP*, No. 14-CV-428, 2015 WL 845723, at *5 (S.D.N.Y. Feb. 26, 2015) (dismissing Title VII discrimination claim because the "[p]laintiff's dissatisfaction with the work assigned (or not assigned) to him by his supervisors is insufficient to make out an adverse employment action"); *Grant v. N.Y. State Office for People with Developmental*

---

[3] Of these allegations, only the first—assignment to a less desirable shift—appears within the Amended Complaint's section alleging a racially hostile and discriminatory work environment.  (*See* Am. Compl. ¶¶ 13–24.)  The latter three fall within the section concerning retaliation, though the cited paragraphs do not contain language specific to that cause of action.  (*See id.* ¶¶ 25–46.)  While by no means obligated to do so, *see Patane v. Clark*, 508 F.3d 106, 112–13 (2d Cir. 2007) (per curiam) (affirming dismissal of Title VII discrimination claims where "the only specific employment actions that might qualify as 'materially adverse'" were "characterize[d] [by the plaintiff] as retaliatory and not gender-based"), the Court gives Plaintiffs the benefit of the doubt and considers the broader context of the Amended Complaint in analyzing this Title VII discrimination claim.

*Disabilities*, No. 12-CV-4729, 2013 WL 3973168, at *7 (E.D.N.Y. July 30, 2013) (dismissing

Title VII discrimination claim because the plaintiff's "assignment to more onerous work

assignments" did not constitute an adverse employment action); *Seale v. Madison Cty.*, 929 F.

Supp. 2d 51, 75 (N.D.N.Y. 2013) ("A change in an employee's schedule, without more, is not an

adverse employment action in the context of a discrimination claim."); *Hill v. Rayboy-

Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006) (finding that a "change in job

responsibilities" and "underutilization of [the] [p]laintiff's skills" were not adverse employment

actions in the absence of "materially adverse changes in employment, such as a demotion or a

loss of wages"); *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005)

("[R]eceiving unfavorable schedules or work assignments do not rise to the level of adverse

employment actions because they do not have a material impact on the terms and conditions of

[the] [p]laintiff's employment." (alterations and internal quotation marks omitted)).

        Thus, none of the alleged conduct constitutes an adverse employment action for purposes

of Title VII discrimination.  "Because a discrimination claim is necessarily implausible absent

such an allegation, [the Court] need not reach the question of whether any hypothetical injury

could plausibly have been attributed to discriminatory animus."  *Petyan v. N.Y.C. Law Dep't*,

No. 14-CV-1434, 2015 WL 1855961, at *9 (S.D.N.Y. Apr. 23, 2015) (alteration in original)

(quoting *Chung v. City Univ. of N.Y.*, 605 F. App'x 20, 23 (2d Cir. 2015)), *adopted by* 2015 WL

4104841 (S.D.N.Y. July 2, 2015).  Ward's Title VII discrimination claim against DOT is thereby

dismissed.[4]

---

        [4] Even looking to other allegations contained in the Amended Complaint, (*see* Am.
Compl. ¶ 17 (alleging vandalism against Ward's office as well as destruction of his personal and
business records); *id.* ¶ 37 (alleging Shaddock "refused to directly communicate or acknowledge
Ward"); *id.* ¶ 38 (alleging "[P]laintiffs' work performance received a heightened degree of
scrutiny and criticism from Shaddock"); *id.* ¶ 39 (alleging "Shaddock filed false reports and

<u>2.  Hostile Work Environment Claims Against Shaddock and DOT</u>

The Amended Complaint further alleges that Shaddock subjected Plaintiffs to a racially hostile work environment.  (*See* Am. Compl. ¶¶ 13–24.)  In response, Shaddock argues that Plaintiffs have failed to plausibly plead such a claim under § 1983.  (*See* Shaddock's Mem. of Law in Supp. of Mot. ("Shaddock's Mem.") 11–14 (Dkt. No. 54).)  DOT also contends that the Amended Complaint has not alleged sufficient facts to state a Title VII claim for hostile work environment, (*see* DOT's Mem. 13–15), and, in any event, that it cannot be held liable for Shaddock's conduct, (*see id.* at 22–24).

<u>a.  Existence of a Hostile Work Environment</u>

To state a hostile work environment claim, a plaintiff must plead conduct that "(1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected status]."  *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (per curiam) (alterations and internal

---

allegations about or concerning Ward"); *id.* ¶ 40 (alleging "Shaddock intentionally deprived Ward of necessary safety equipment")), the Court finds that conduct would similarly fail to satisfy the threshold for adverse employment action, *see Avillan v. Donahoe*, 483 F. App'x 637, 638 (2d Cir. 2012) (concluding that "having personal items removed from a locker" does not constitute adverse action); *Henry*, 18 F. Supp. 3d at 407 (holding that "the alleged manufacturing of charges against [the plaintiff]" did not constitute an adverse employment action); *Miksic v. TD Ameritrade Holding Corp.*, No. 12-CV-4446, 2013 WL 1803956, at *4 (S.D.N.Y. Mar. 7, 2013) ("[I]t is well established [that] ostracism and isolation at work is not enough to constitute an adverse employment action." (second alteration in original) (internal quotation marks omitted)); *Murphy v. Suffolk Cty. Cmty. Coll.*, No. 10-CV-251, 2011 WL 5976082, at *6 (E.D.N.Y. Nov. 29, 2011) (explaining that "the denial of . . . safety equipment," on its own, is likely insufficient to constitute an adverse employment action); *Hubbard v. Port Auth.*, No. 05-CV-4396, 2008 WL 464694, at *12 (S.D.N.Y. Feb. 20, 2008) ("[R]eprimands, threats of disciplinary action[,] and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." (internal quotation marks omitted)).

quotation marks omitted); *see also Ruiz v. City of N.Y.*, No. 14-CV-5231, 2015 WL 5146629, at *8 (S.D.N.Y. Sept. 2, 2015) (same).  The same standard is used, regardless of whether allegations are brought pursuant to § 1983 or Title VII.  *See Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011), *reconsideration denied* 982 F. Supp. 2d 225 (E.D.N.Y. 2013).  In evaluating hostile work environment claims, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993); *see also Ruiz*, 2015 WL 5146629, at *8 (same).  To survive a Rule 12(b)(6) motion, "a plaintiff need only plead facts sufficient to support the conclusion that [he] was faced with harassment of such quality or quantity that a reasonable employee would find the conditions of [his] employment altered for the worse."  *Patane*, 508 F.3d at 113 (alteration and internal quotation marks omitted).  "The Second Circuit has 'repeatedly cautioned against setting the bar too high' in this context."  *Ruiz*, 2015 WL 5146629, at *8 (quoting *Patane*, 508 F.3d at 113).  Notably, while a few isolated racial slurs may not suffice, *see Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997), the repeated use of certain clearly offensive and abusive language can create a hostile work environment, *see Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000).

Plaintiffs in the instant Action have met that bar.  The Amended Complaint alleges a pattern of racial slurs and derogatory remarks by Shaddock over the course of at least seven years.  (*See* Am. Compl. ¶¶ 15–16.)  According to Plaintiffs, Shaddock "*regularly* expressed contempt for African Americans generally and the African-American workers under his supervision," (*id.* ¶ 15 (emphasis added)), in addition to "*regularly* ma[king] racially charged

14

jokes and references about the African-American workers under his command," (*id.* ¶ 16

(emphasis added)).[5]  Though the Amended Complaint "is not entirely specific about the exact

dates of certain incidents," *Watson v. Am. Red Cross Blood Servs.*, 468 F. Supp. 2d 484, 488

(W.D.N.Y. 2007) (emphasis omitted), or "about the frequency of the comments," *Myles v. A &*

*L, Inc.*, No. 08-CV-205, 2009 WL 4892098, at *3 (W.D.N.Y. Dec. 11, 2009), such specificity is

not required at this stage, *see Watson*, 468 F. Supp. 2d at 488; *cf. Sawka v. ADP, Inc.*, No. 13-

CV-754, 2015 WL 5708571, at *13 (D. Conn. Sept. 29, 2015) (finding the "fact that [the

plaintiff] does not remember the details of many of the incidents does not warrant the grant of

[the defendant's] summary judgment motion alone, because he has testified that the incidents

occurred frequently"); *Fernot v. Crafts Inn, Inc.*, 895 F. Supp. 668, 677 (D. Vt. 1995) ("The fact

that the testimony indicated that [the supervisor] was 'always' making sexual remarks and

---

[5] The Court finds unavailing Shaddock's contention that the Amended Complaint's allegations relating either to "Ward or to unnamed non-parties . . . are . . . of no moment with regard to the sufficiency of the claims by Watson and Mathis."  (Shaddock's Mem. 11.)  In "deciding whether an incident or series of incidents is sufficiently severe or pervasive to alter the conditions of a plaintiff's working environment . . . , courts must assess the totality of the circumstances."  *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014); *see also Haggood v. Rubin & Rothman, LLC*, No. 14-CV-34, 2014 WL 6473527, at *19 (E.D.N.Y. Nov. 17, 2014) ("Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." (some internal quotation marks omitted)).  That totality necessarily includes allegations not specific to Watson and Mathis.  *See Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) ("One of the critical inquiries in a hostile environment claim must be the *environment*.  Evidence of a general work atmosphere—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim." (alterations and internal quotation marks omitted)); *Bright v. Coca Cola Refreshements USA, Inc.*, No. 12-CV-234, 2014 WL 5587349, at *2 (E.D.N.Y. Nov. 3, 2014) ("A plaintiff may support a hostile work environment claim with incidents that he or she did not personally witness or hear."), *aff'd sub nom. Bright v. Coca-Cola Refreshments USA, Inc.*, 639 F. App'x 6 (2d Cir. 2015); *Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 378 (S.D.N.Y. 2006) ("Because the crucial inquiry focuses on the nature of the workplace environment *as a whole*, a plaintiff who herself experiences discriminatory harassment need not herself be the target of other instances of hostility in order for those incidents to support her claim." (quoting *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001))).

regularly leered at [the plaintiff], rather than giving specific dates, does not negate its role in establishing a work environment of sufficiently pervasive sexual harassment.").[6]  Plaintiffs' allegations of recurring comments by Shaddock set forth "a series of incidents . . . sufficiently continuous and concerted" to give rise to an inference that there was a change in Plaintiffs' work environment, *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (internal quotation marks omitted); *see also, e.g.*, *id.*, at 148, 154–56 (finding the plaintiff plausibly pled a claim for hostile work environment in alleging that the defendant made various harassing comments that undermined her ability to lead); *Carter v. Donahoe*, No. 14-CV-10, 2014 WL 5421248, at *2 (D. Conn. Oct. 22, 2014) (finding the plaintiff stated a hostile work environment claim based on allegations that the plaintiff's "supervisor singled [him] out for 'harassment'" as "one of the oldest employees in his unit" and "made age-based derogatory comments to him"); *Morris v. David Lerner Assocs.*, 680 F. Supp. 2d 430, 441 (E.D.N.Y. 2010) (holding that the "complaint state[d] a plausible claim that [the plaintiff] was subjected to a hostile work environment" where she "cite[d] a series of sex-based comments that were allegedly made by [a] defendant . . . to her in the workplace").  In so doing, the Amended Complaint alleges far "more than a few isolated incidents of racial enmity," *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 724 (2d Cir. 2010) (internal quotation marks omitted), and instead plausibly suggests "a steady barrage of opprobrious racial comments" by Shaddock, *Schwapp*, 118 F.3d at 110 (internal quotation marks

---

[6] While Shaddock evidently seeks to impose heightened pleading standard, (*see, e.g.*, Shaddock's Mem. 13 (arguing that Watson's and Mathis' allegations "are insufficient to meet the 'demanding' standard for stating a hostile work environment claim")), it is well established that complaints in discrimination cases "must satisfy only the simple requirements of Rule 8(a)," *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 513 (2002); *see also Hanson v. Nassau Cty. Dep't of Pub. Works*, No. 06-CV-6174, 2007 WL 1526426, at *1 (E.D.N.Y. May 23, 2007) (explaining that a complaint alleging discrimination, hostile work environment, and/or retaliation need not establish a prima facie case of discrimination in order to survive a motion to dismiss).

16

omitted); *cf. Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 120 (2d Cir. 2010)

(explaining that "general allegations of constant abuse" could support a "find[ing] [of] pervasive

harassment, even in the absence of specific details about each incident" (internal quotation marks

omitted)).[7]  The alleged regularity of these comments distinguishes this case from many of the

decisions cited by Defendants, (*see* DOT's Mem. 14–15, 15 n.9), most of which notably

occurred at the summary judgment stage, *see, e.g.*, *Albert-Roberts v. GGG Constr., LLC*, 542 F.

App'x 62, 64 (2d Cir. 2013) (affirming grant of summary judgment to employer where the

plaintiff alleged only "the single use" of a racial slur); *Singletary v. Mo. Dep't of Corr.*, 423 F.3d

886, 893 (8th Cir. 2005) (affirming summary judgment in favor of employer where there were

only a few incidents of the use of racial epithets over a period of years); *Haggood v. Rubin &*

*Rothman, LLC*, No. 14-CV-34, 2014 WL 6473527, at *18 (E.D.N.Y. Nov. 17, 2014) (finding

that some co-workers' use of racial remarks on four occasions over 33 months, "without more, is

insufficient to state a claim of a racially hostile work environment"); *Tavares v. Sam's Club*, 178

F. Supp. 2d 96, 102 (D. Conn. 2001) (granting the defendants' motion for summary judgment

---

[7] DOT contends that although Plaintiffs "vaguely assert that 'Shaddock regularly made racially charged jokes and references' and 'regularly expressed contempt for African-Americans,'" the Amended Complaint "does not allege that the racial slurs themselves were made regularly."  (DOT's Mem. 14 n.8 (quoting Am. Compl. ¶¶ 15–16).)  The Court, however, is unmoved by this attempt to parse the language of the allegations and instead reads the paragraphs as a whole.  In any event, it is unclear why the distinction between racial slurs and other racially charged remarks would make any difference.  *See Schwapp*, 118 F.3d at 110 (explaining that "a steady barrage of opprobrious racial *comments*" can "constitute a hostile work environment" (emphasis added) (internal quotation marks omitted)); *cf. Carter*, 2014 WL 5421248, at *2 (finding the plaintiff stated a hostile work environment claim through allegations that his supervisor "made age-based derogatory *comments* to him" (emphasis added)); *Morris*, 680 F. Supp. 2d at 441 (holding that the "complaint state[d] a plausible claim that [the plaintiff] was subjected to a hostile work environment" where she "cite[d] a series of sex-based *comments*" (emphasis added)).

where the plaintiff proffered evidence of only "two remarks that were reported to her" in support of her hostile work environment claim).

While Defendants argue that "there is no allegation that any of th[e] alleged [epithets or jokes] occurred in [P]laintiffs' presence or that any of it was directed to them personally," (Shaddock's Mem. 11; *see also* DOT's Mem. 14–15), "the mere fact that [a] plaintiff was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim," *Whidbee*, 223 F.3d at 71 (alterations and internal quotation marks omitted); *see also Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-8812, 2015 WL 1499618, at *61 (S.D.N.Y. Mar. 27, 2015) ("A plaintiff need not herself be the target of discriminatory comments in order for those comments to contribute to a hostile work environment; nor does the plaintiff need to hear such comments first-hand."); *Moore v. Metro. Transp. Auth.*, 999 F. Supp. 2d 482, 503 (S.D.N.Y. 2013) ("It is not necessary that offensive remarks or behavior be directed at individuals who are members of the plaintiff's own protected class for those remarks to support a plaintiff's claim." (internal quotation marks omitted)). Indeed, even if Plaintiffs previously had been unaware of the remarks Shaddock made "in the presence of an exclusively white audience," (Am. Compl. ¶ 16), it is plausible that "the persistently offensive conduct created an overall 'hostile or abusive environment,' which exacerbated the effect of the harassment [Plaintiffs] experienced individually," *Moore*, 999 F. Supp. 2d at 503–04 (alteration omitted); *see also Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 378 (S.D.N.Y. 2006) (explaining that alleged comments "very well may be relevant to a determination of whether the hostility was severe and pervasive, from an objective standpoint, regardless of whether or not [the plaintiff] was aware of or present for the comments at the time they were made"). "[T]he fact that a plaintiff learns second-hand of a racially

derogatory comment or joke by a fellow employee or supervisor also can impact the work environment." *Whidbee*, 223 F.3d at 71 (internal quotation marks omitted).

The Court thus finds unavailing DOT's contention that the Amended Complaint fails to "allege that, over this eight-year period, [Ward] ever heard or complained about the alleged slurs, so it could not have affected his work environment . . . ." (DOT's Mem. 14–15 (citing, inter alia, *Harris*, 510 U.S. at 21–22).)  For one, the Amended Complaint does, in fact, plead that Ward complained about Shaddock's conduct, in that he filed an internal complaint with DOT's Diversity Management Bureau in May 2013.  (Am. Compl. ¶ 25.)  The filing of this complaint further suggests that Ward *did* "subjectively perceive the environment to be abusive," *Harris*, 510 U.S. at 21, such that the conduct, which also included Shaddock's discriminatory hiring practices, the discriminatory manner in which he made job assignments, and his acquiescence in racially discriminatory conduct by Caucasian subordinates, (*see* Am. Compl. ¶¶ 17–24), could have "actually altered the conditions of [Ward's] employment, *Harris*, 510 U.S. at 21–22.[8]

---

[8] Because "a hostile work environment claim is not based solely on allegations of racial slurs or derogatory remarks" but may also include "[o]ther incidents of different treatment based on race that are related to the terms and conditions of employment," *Watson*, 468 F. Supp. 2d at 488, the Court may properly consider these additional acts as contributing to the hostile work environment, *see Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) ("In a hostile work environment case, it may well be a proper exercise of the district court's broad discretion to allow the plaintiff to build [a] case partly by adducing incidents for which the link to any discriminatory motive may, in the first instance, appear tenuous or nonexistent.").  For example, that the majority of African-Americans working at the Monticello facility had been assigned to the less desirable evening shift between 2001 and 2014, (*see* Am. Compl. ¶ 22), could reasonably impact the work environment, *see Hemans v. Long Is. Jewish Med. Ctr.*, No. 10-CV-1158, 2010 WL 4386692, at *11 (E.D.N.Y. Oct. 28, 2010) (concluding that "other alleged incidents," "including a transfer" and "denial of overtime, . . . as a whole [were] sufficient . . . to state a plausible hostile work environment claim"); *Svenningsen v. Coll. of Staten Is.*, No. 01-CV-7550, 2003 WL 21143076, at *2 (E.D.N.Y. Mar. 28, 2003) (finding the plaintiff stated a hostile work environment claim in alleging, inter alia, "that, for reasons of unlawful discrimination, [the] [d]efendants . . . effectively demoted [her]," "prevented [her] from being asked to review professional articles," and "denied re-appointment to a colleague because of the colleague's close association with [the] [p]laintiff").

Adequately pleading that Plaintiffs "subjectively perceive[d]" the environment as "hostile or abusive," *Patane*, 508 F.3d at 113, the Amended Complaint alleges that Shaddock's actions not only "undermined Ward's authority to supervis[e] his Caucasian subordinates, (Am. Compl. ¶ 17), but also caused "[P]laintiffs [to] suffer[] humiliation, indignity[,] and degradation on account of their race," (*id.* ¶ 47).

Furthermore, while DOT argues that the Amended Complaint "does not allege that this [use of racial slurs and racially demeaning language] was 'coupled with threats of physical violence,'" (DOT's Mem. 14 (quoting *Albert-Roberts*, 542 F. App'x at 64)), the Court (unsurprisingly) has found no authority to suggest that racially charged comments are not actionable in the absence of threats of physical violence, *cf. Carter*, 2014 WL 5421248, at *2 (finding the plaintiff plausibly pled a hostile work environment claim based on comments made without any threat of violence); *Morris*, 680 F. Supp. 2d at 441 (finding the "complaint state[d] a plausible claim that she was subjected to a hostile work environment" based on "hostile and abusive comments" unaccompanied by any allegations of physical threats).  Quite the contrary, it is well settled that "[w]hether the alleged conduct is physically threatening is *just one* of the factors courts look to in determining whether an environment is hostile."  *Prince*, 427 F. Supp. 2d at 379 (emphasis added).[9]  As noted, Plaintiffs' allegations of an extended pattern of racial epithets and slurs play an essential role as well.  *See Whidbee*, 223 F.3d at 70–71 (considering a "stream of racially offensive comments" as "evidence of a hostile work environment").

---

[9] To further emphasize, while it can be said that "[t]he use of racially offensive language is *particularly likely* to create a hostile work environment when . . . presented in a 'physically threatening' manner," *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014) (emphasis added), there is no requirement that slurs or epithets be presented in that way.

Accordingly, the Amended Complaint has alleged various acts by Shaddock that a

reasonable employee could perceive as racially hostile or abusive. *See Patane*, 508 F.3d at 113.

Plaintiffs have also pled facts that, as a whole, support the claim that they subjectively found "the

workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [were]

sufficiently severe or pervasive to alter the conditions of [their] employment . . . ." *Harris*, 510

U.S. at 21 (internal quotation marks omitted). For these reasons, the Court denies Shaddock's

Motion with respect to the hostile work environment claim. The inquiry as to DOT, however,

does not end there.

### b.  Employer Liability

"Under Title VII, an employer's liability for such harassment may depend on the status of

the harasser." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). For an employer to be

held liable for a hostile work environment, the plaintiff must demonstrate either that "a

supervisor used his or her authority to further the creation of a discriminatorily abusive working

environment, or that the employer knew or reasonably should have known about harassment by

non-supervisory co-workers, yet failed to take appropriate remedial action." *Turley v. ISG*

*Lackawanna, Inc.*, 774 F.3d 140, 153 (2d Cir. 2014) (footnote, citations, and internal quotation

marks omitted). Where the offensive behavior occurs at the hands of a co-worker, "the employer

is liable only if it was negligent in controlling working conditions," *Vance*, 133 S. Ct. at 2439,

such as where it "did not monitor the workplace, failed to respond to complaints, failed to

provide a system for registering complaints, or effectively discouraged complaints from being

filed," *id.* at 2453. On the other hand, "[w]here an employee is harassed by a supervisor, an

employer may be vicariously liable for the creation and persistence of a hostile work

environment." *Bethea v. City of N.Y.*, No. 11-CV-2347, 2014 WL 2616897, at *5 (E.D.N.Y.

21

June 12, 2014).  In this context, a "supervisor" is one who "is empowered by the employer to take tangible employment actions against the victim."  *Vance*, 133 S. Ct. at 2439.  "A 'tangible employment action' involves a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  *Bethea*, 2014 WL 2616897, at *6 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

DOT argues that Shaddock was not Ward's supervisor for purposes of vicarious liability under Title VII.  (*See* DOT's Mem. 22–24.)[10]  In response, Plaintiffs submit three bases for finding that Shaddock falls within the definition of "supervisor" under *Vance*:  he "used his higher authority" as a Highway Maintenance Supervisor II (a) "to perpetuate a racist hostile environment by encouraging, permitting[,] and condoning . . . racially discriminatory conduct committed by Shaddock and other Caucasian employees," (b) "to pre-screen applicants in a racially discriminatory manner and thereby contribute to the racially hostile environment," and (c) "to assign nearly all of the Residency's minority employees to the less desirable evening shift."  (Pls.' Opp'n 19.)  These assertions, however, fail to suggest that Shaddock had the power to (or did) hire, fire, or in any other way "effect a tangible change in [Ward's] terms or conditions of employment."  *Vance*, 133 S. Ct. at 2448.  Even if Shaddock's "pre-screening" of job applications between 2006 and 2014 could render him a "supervisor" with respect to

---

[10] Curiously, Shaddock argues that "it is of crucial significance that [he] was not a supervisor of Watson or Mathis."  (Shaddock's Reply in Supp. of Mot. ("Shaddock's Reply") 4 (Dkt. No. 58).)  Though he seeks to use the Supreme Court's decision in *Vance* as a shield against his own liability, (*see id.* at 4–5), that case examined under what circumstances "*an employer*" may be vicariously liable for an employee's unlawful harassment," *Vance*, 133 S. Ct. at 2443 (emphasis added).  Thus, whether DOT "empowered [Shaddock] to take tangible employment actions against [Plaintiffs]" has no bearing on Watson's and Mathis' claim against Shaddock.  *Id.*

applicants or new hires from that period, (*see* Am. Compl. ¶¶ 18–19), it would not make him

*Ward's* supervisor, *see Vance*, 133 S. Ct. at 2439 (defining "supervisor" as one

"empowered . . . to take tangible employment actions *against the victim*" (emphasis added));

*accord Zerfas* v. *Burwell*, No. 14-CV-2806, 2015 WL 3949372, at *10 n.5 (D. Md. June 26,

2015) (noting that even if an employee "played a key role in hiring [certain] individuals, that

shows only that he may have been the supervisor of those other individuals and is not relevant to

his status with respect to [the plaintiff]" (citation omitted)), since Ward was hired by DOT long

before Shaddock assumed the role of Highway Maintenance Supervisor II for Residency 9-7,

(*see* Am. Compl. ¶¶ 1, 5).  Nor do any other facts contained in the Amended Complaint raise a

plausible inference that Shaddock had the ability to hire, fire, promote, reassign, or significantly

change Ward's benefits within the meaning of *Vance*.  The allegation that Shaddock was

responsible for Plaintiffs' "day-to-day work assignments and allocation of equipment," (*id.* ¶ 5),

falls well below that threshold, *see Vance*, 133 S. Ct. at 2443 (rejecting definition that "ties

supervisor status to the ability to exercise significant direction over another's daily work");

*Fornah v. Cargo Airport Servs., LLC*, No. 12-CV-3638, 2014 WL 25570, at *6 (E.D.N.Y. Jan. 2,

2014) (finding a defendant "was not a supervisor under *Vance*" because neither "assigning tasks

outside [the] [p]laintiff's job duties" nor "the power to grant or deny days off . . . constitute[s] a

tangible employment action"); *accord Travis v. City of Chi.*, No. 10-CV-3011, 2014 WL

4909060, at *12 (N.D. Ill. Sept. 30, 2014) (finding a defendant did not qualify as a supervisor

under *Vance* because "[her] control over [the plaintiff] [wa]s limited to distributing daily work

assignments . . . and recommending discipline to her superiors"), *order clarified*, 2014 WL

7177633 (N.D. Ill. Dec. 16, 2014); *McKinnish v. Donahoe*, 40 F. Supp. 3d 689, 696–97

(W.D.N.C. 2014) (rejecting, in light of *Vance*, the "plaintiff's argument that vicarious liability

should attach based on the ability to control an employee's hours . . . or an employee's assignments within their job description"), *aff'd sub nom. McKinnish v. Brennan*, 630 F. App'x 177 (4th Cir. 2015).

The Court finds unavailing Plaintiffs' contention that they "be given the opportunity to conduct discovery" in advance of any determination as to Shaddock's supervisory status.  (Pls.' Opp'n 20.)  Such a step is appropriate where a plaintiff has stated a plausible claim involving a supervisor, *see, e.g.*, *Bethea*, 2014 WL 2616897, at *9 (noting that the complaint had "set[] forth detailed allegations" before concluding that whether particular defendants "actually acted as [the] [p]laintiff's supervisor within the meaning of *Vance*" would "requir[e] discovery and, possibly, trial"), but Plaintiffs are not relieved of their obligation to provide sufficient facts "to raise [their] right to relief above the speculative level," *Twombly*, 550 U.S. at 555; *see also Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 460 (S.D.N.Y. 2013) (concluding that an individual did not qualify as a supervisor under *Vance* because the plaintiff failed to "allege[] any facts suggesting . . . that he had the authority to significantly change [the] [p]laintiff's employment status" (internal quotation marks omitted)), *aff'd sub nom. Dabney v. Bed Bath & Beyond*, 588 F. App'x 15 (2d Cir. 2014); *accord LeBlanc v. Hill Sch.*, No. 14-CV-1674, 2015 WL 144135, at *21 (E.D. Pa. Jan. 12, 2015) (concluding that the plaintiff "d[id] not plausibly allege a vicarious liability hostile work environment claim" in the absence of allegations "that [the employee] was empowered to take tangible employment actions against [her]").

As there are no facts from which Plaintiffs could plausibly allege that Shaddock was "empowered by [DOT] to take tangible employment actions against [Ward]," liability can be imputed to DOT only if it were "negligent in controlling working conditions."  *Vance*, 133 S. Ct. at 2439.  However, neither the Amended Complaint nor Plaintiffs' opposition puts forth any

allegations that DOT "did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed." *Id.* at 2453.[11]  To the contrary, the Amended Complaint alleges that Shaddock was disciplined and relieved of his position as Residency 9-7's Highway Maintenance Supervisor II after Ward filed his internal complaint.  (*See* Am. Compl. ¶¶ 11, 25.)  *See also Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (affirming dismissal of harassment claims because the defendant met its "remedial obligation to address and end the harassment").

Because Plaintiffs have failed to plausibly allege vicarious liability for Shaddock's actions or DOT negligence in allowing the hostile workplace environment to persist, *see Vance*, 133 S. Ct. at 2453, the Court dismisses the hostile work environment claim against DOT.

### 2.  Retaliation Claims Against Shaddock and DOT

The Amended Complaint also sets forth allegations of unlawful retaliation against Plaintiffs for filing an internal complaint, (*see* Am. Compl. ¶¶ 25–46), brought by Watson and Mathis against Shaddock pursuant to § 1983 and by Ward against DOT pursuant to Title VII, (*see id.* ¶¶ 49–50; *cf.* Pls.' Opp'n 20).  Plaintiffs specifically allege that the described acts "were motivated by racial animus and/or in retaliation for [P]laintiffs' complaints of racial discrimination."  (Am. Compl. ¶ 44; *see also id.* ¶¶ 42–43.)

---

[11] It is simply untrue that at this stage the Court cannot "determine the separate question of whether Shaddock's failure to abate the racist environment . . . constitutes negligence on the part of . . . DOT." (Pls.' Opp'n 19–20.)  Indeed, the Amended Complaint's silence on this point speaks for itself. *See Lekettey v. City of N.Y.*, 637 F. App'x 659, 662 (2d Cir. 2016) (summary order) (affirming dismissal where the "complaint allege[d] no facts from which it c[ould] be plausibly inferred that [the] defendants were negligent or unresponsive to [the plaintiff's] complaints about the workplace"); *accord McLaurin v. Verizon Md., Inc.*, No. 14-CV-4053, 2015 WL 5081622, at *4 (D. Md. Aug. 26, 2015) (holding that "the acts of [the] [p]laintiff's coworkers cannot be imputed to [the] [d]efendant" where "she d[id] not allege that [her employer] negligently failed to control her working conditions, nor even that [her employer] was aware of these incidents").

Title VII's anti-retaliation provision prohibits an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).  In other words, "Title VII forbids an employer to retaliate against an employee for . . . complaining of employment discrimination prohibited by Title VII." *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006).  Thus, "for a retaliation claim to survive . . . a motion to dismiss, the plaintiff must plausibly allege that:  (1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015).

Along similar lines, the Fourteenth Amendment protects public employees from racial discrimination and retaliation for complaining about race discrimination.  *See Voccola v. Rooney*, 136 F. Supp. 3d 197, 205 (D. Conn. 2015).[12]  "[P]ublic employees aggrieved by discrimination in the terms of their employment may bring suit under . . . § 1983 against any responsible persons acting under color of state law." *Vega*, 801 F.3d at 87.  Where, as here, there is no dispute over whether a defendant acted under the color of state law, "a plaintiff's equal protection claim parallels his Title VII claim, except that a § 1983 claim, unlike a Title VII claim, can be brought against an individual." *Id.*  Under either statute, a plaintiff "need not specifically plead every element" to survive a motion to dismiss; rather, he must allege just enough factual matter to "render [the] retaliation claims plausible." *Reid v. Ingerman Smith*

---

[12] Citing outdated cases, Shaddock argues that "[r]etaliation for complaining of racial discrimination is not an Equal Protection Clause violation." (Shaddock's Mem. 2.)  The Second Circuit, however, has held that "retaliation claims alleging an adverse action because of a complaint of discrimination are actionable under § 1983," *Vega*, 801 F.3d at 82, and such retaliation "is, by its very nature, intentional discrimination," *Edwards v. Khalil*, No. 12-CV-8442, 2016 WL 1312149, at *28 (S.D.N.Y. Mar. 31, 2016) (citing *Vega*, 801 F.3d at 82).

*LLP*, 876 F. Supp. 2d 176, 187 (E.D.N.Y. 2012) (citing *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d

67, 71–72 (2d Cir. 2006)); *see also Gomez v. Stonybrook Univ.*, No. 14-CV-7219, 2016 WL

1039539, at *10 (E.D.N.Y. Jan. 28, 2016) (noting that *Vega* imposes a "minimal burden . . . at

this early juncture"), *adopted by* 2016 WL 1045536 (E.D.N.Y. Mar. 15, 2016).

### a.  Adverse Employment Action

Shaddock argues that the Amended Complaint contains "no allegation that [Plaintiffs]

suffered a 'materially' adverse job action as a result of any alleged conduct on [his] part . . . ."

(Shaddock's Reply in Supp. of Mot. ("Shaddock's Reply") 3 (Dkt. No. 58); *see also* Shaddock's

Mem. 10.)  DOT similarly contends that the Amended Complaint fails to adequately plead that

Ward suffered any adverse employment action.  (*See* DOT's Mem. 16–19.)

For purposes of a retaliation claim, an adverse employment action is one that "could well

dissuade a reasonable worker from making or supporting a charge of discrimination."  *Vega*, 801

F.3d at 90–91 (internal quotation marks omitted).[13]  Although "petty slights or minor annoyances

that often take place at work and that all employees experience do not constitute actionable

retaliation," *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (internal quotation marks

---

[13] The showing a plaintiff must make to set out an adverse employment action required for a retaliation claim is lower than that required for a discrimination claim; a plaintiff must only show that the employer's action would cause a "reasonable worker" to be dissuaded from making or supporting a charge of discrimination.  *See Benedith v. Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 332 (E.D.N.Y. 2014) ("[T]he Supreme Court held that a plaintiff asserting a retaliation claim need not show adverse conduct which affects the terms and conditions of employment.  Rather, it is sufficient to show conduct which might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).  "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII." *Gomez*, 2016 WL 1039539, at *9.  Simply put, "anti-retaliation protection is broader and extends beyond workplace-related or employment-related retaliatory acts and harm."  *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (internal quotation marks omitted).

omitted), "a materially adverse action need not affect the plaintiff's terms and conditions of employment," *Klein v. New York Univ.*, 786 F. Supp. 2d 830, 848 (S.D.N.Y. 2011).

In the instant Action, Plaintiffs allege that, subsequent to the filing of Ward's internal complaint on May 6, 2013, Shaddock assigned Plaintiffs almost exclusively to arduous and dirty tasks, (Am. Compl. ¶¶ 35–36), and that he filed false reports and allegations about their work performance, (*id.* ¶ 39). The Amended Complaint further alleges that "on or after May 6, 2013[,] Shaddock intentionally deprived Ward of necessary safety equipment to perform daily tasks," (*id.* ¶ 40), and "reduced the number of men under Ward's supervision," (*id.* ¶ 41).[14] Notwithstanding Defendants' arguments to the contrary, (*see* DOT's Mem. 17; Shaddock's Mem. 10), these allegations present more than mere generalizations and instead identify the "specific retaliatory conduct" by Shaddock that forms the basis of these claims, *see Cruz v. N.Y.*

---

[14] Plaintiffs also allege "[t]hat on or after May 6, 2013 [their] work performance received a heightened degree of scrutiny and criticism from Shaddock . . . ." (Am. Compl. ¶ 38.) However, it is well-settled that "[t]o qualify as an adverse employment action, excessive scrutiny must be accompanied by unfavorable consequences." *Chacko v. Connecticut*, No. 07-CV-1120, 2010 WL 1330861, at *13 (D. Conn. Mar. 30, 2010) (internal quotation marks omitted); *see also MacEntee v. IBM (Int'l Bus. Machines)*, 783 F. Supp. 2d 434, 446 (S.D.N.Y. 2011) (holding that the plaintiff's allegations of close monitoring by her supervisor "d[id] not constitute an 'adverse employment action'"), *aff'd sub nom. MacEntee v. IBM*, 471 F. App'x 49 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 985 (2013), *reh'g denied*, 133 S. Ct. 1751 (2013). Because the Amended Complaint alleges no such consequences, this Court cannot find the "heightened degree of scrutiny and criticism" to constitute adverse action. *See Anand v. N.Y. State Dep't of Taxation & Fin.*, No. 10-CV-5142, 2013 WL 3874425, at *9 (E.D.N.Y. July 25, 2013) ("[C]ourts have found that reprimands, threats of disciplinary action[,] and excessive scrutiny do not constitute adverse actions in a Title VII retaliation context." (internal quotation marks omitted)). Nor can the Court say that the reassignments to older equipment, as alleged in the Amended Complaint, (*see* Am. Compl. ¶¶ 33–34), rise above the kind of "petty slights" or "minor annoyances" that are not actionable, *White*, 548 U.S. at 68; *cf. Seale v. Madison Cty.*, No. 11-CV-278, 2015 WL 667531, at *20 (N.D.N.Y. Feb. 17, 2015) (finding that the plaintiff's assignment to use a van that was "dirty, smelly," and without properly functioning brakes "d[id] not rise to the level of adverse action required to prevail on a Title VII retaliation claim"); *Klein*, 786 F. Supp. 2d at 849 (holding that unfavorable office assignments and schedules "are not materially adverse actions in the retaliation context"). However, as discussed in depth below, many of Plaintiffs' other allegations do rise to that level.

*State Dep't of Corr. & Cmty. Supervision*, No. 13-CV-1335, 2014 WL 2547541, at *6 (S.D.N.Y. June 4, 2014) (explaining that a plaintiff must "show specific retaliatory conduct" in order "to state a plausible Title VII retaliation claim"); *cf. Baez v. Visiting Nurse Serv. of N.Y. Family Care Serv.*, No. 10-CV-6210, 2011 WL 5838441, at *6 (S.D.N.Y. Nov. 21, 2011) (finding that "generalized 'harassment, bullying, intimidations, and stalking' . . . after filing [a complaint] are too non-specific to support a retaliation claim" (alterations omitted)).  The Court cannot say at this early stage that the identified conduct—namely, reassignment to arduous and dirty tasks, filing of false disciplinary reports, deprivation of necessary safety equipment, and reduction of supervisory responsibility—is insufficient as a matter of law to be materially adverse.  *See, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006) (finding reassignment that led to tasks that were dirtier, more arduous, and less prestigious could be considered materially adverse); *Hicks*, 593 F.3d at 170 (finding that allegations of punitive scheduling can constitute "adverse employment actions" for purposes of a retaliation claim); *Kessler*, 461 F.3d at 209–10 (finding "a rational factfinder could permissibly infer that a reasonable employee . . . could well be dissuaded from making a charge of discrimination if doing so would result in" the loss of previously held "broad discretionary and managerial functions"); *Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 215 (E.D.N.Y. 2014) (noting that "reassignment to a position that is objectively less prestigious can be considered materially adverse in the context of a retaliation claim"); *Howard v. Cannon Indus., Inc.*, No. 11-CV-6100, 2012 WL 5373458, at *9 (W.D.N.Y. Oct. 30, 2012) (concluding the plaintiff established "that she experienced an adverse retaliatory act" where her "transfer was in effect a demotion" and "she was given several spurious disciplinary warnings").

Viewed "both separately and in the aggregate," *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011), the alleged acts "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *White*, 548 U.S. at 68 (internal quotation marks omitted).[15]  Plaintiffs have thus plausibly plead that they suffered adverse employment actions for purposes of their retaliation claims, and at this stage in the litigation they need do no more.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007) (explaining that, at the motion-to-dismiss stage, "the appropriate inquiry is not whether a plaintiff is likely to prevail, but whether he is entitled to offer evidence to support his claims" (alteration and internal quotation marks omitted)).

### b.  Causation

Shaddock further argues that "there is no plausible causal relationship between any conduct by [him] and any adverse job action, whether material or otherwise, against Mathis and Watson."  (Shaddock's Reply 3.)  Along similar lines, DOT argues that Ward has failed to plead a causal connection between any protected activity and any adverse action.  (*See* DOT's Mem. 19–22.)

---

[15] The series of acts alleged by Plaintiffs exceed the threshold in the cases cited by DOT, (*see* DOT's Mem. 18), where courts found *at summary judgment* that conduct did not rise to the level of materially adverse actions for purposes of retaliation claims, *see, e.g.*, *Rodas v. Town of Farmington*, 567 F. App'x 24, 27–28 (2d Cir. 2014) (concluding that "purportedly degrading work assignments . . . within [the plaintiff's] job description," even when viewed in the aggregate with other identified actions, did not constitute an adverse employment action); *Rivera*, 743 F.3d at 26 (concluding that disciplinary citations, assignment to drive dirtier buses, one late overtime payment, and refusal to be provided with a half-day off did not rise to the level of materially adverse actions); *Wright v. City of Syracuse*, No. 10-CV-661, 2014 WL 1293527, at *23 (N.D.N.Y. Mar. 31, 2014) ("The receipt of undesirable work assignments must be accompanied by a materially adverse change in employment, such as demotion or loss of wages, in order to be actionable."), *aff'd*, 611 F. App'x 8 (2d Cir. 2015).  For example, the Amended Complaint alleges not just "undesirable," *see Wright*, 2014 WL 1293527, at *23, or "degrading work assignments," *see Rodas*, 567 F. App'x at 27, but rather pleads reassignment to more arduous tasks and, in the case of Ward, under unsafe conditions, (*see* Am. Compl. ¶¶ 35–36, 40).

30

With respect to the causation element for a claim of retaliation, "a plaintiff must plausibly plead a connection between the act and his engagement in protected activity." *Vega*, 801 F.3d at 90. Such "retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." *Id.* Although there is no bright-line rule concerning the temporal proximity required to draw the causal inference, "it is well settled that when 'mere temporal proximity' is offered to demonstrate causation, the protected activity and the adverse action must occur 'very close' together." *Henry*, 18 F. Supp. 3d at 412 (some internal quotation marks omitted).

Plaintiffs here have not met that threshold. The Amended Complaint asserts that "on or after May 6, 2013" Shaddock assigned Plaintiffs almost exclusively to arduous and dirty tasks, filed false reports about their work performance, deprived Ward of necessary safety equipment, and reduced the number of men under Ward's supervision. (Am. Compl. ¶¶ 34–35, 39–41). This generalized reference to the filing date of Ward's internal complaint is "simply too vague in nature and non-specific as to time to serve as a basis for [their] retaliation claims." *Henry*, 18 F. Supp. 3d at 412 (alteration and internal quotation marks omitted); *cf. Petyan*, 2015 WL 1855961, at *14 (dismissing retaliation claim where the plaintiff merely alleged that he filed a complaint and that the adverse actions "began 'thereafter'"); *Carter v. Verizon*, No. 13-CV-7579, 2015 WL 247344, at *15 (S.D.N.Y. Jan. 20, 2015) (dismissing retaliation claims where the plaintiff "simply state[d] that" the disciplinary action "occurred 'soon thereafter'" the lodging of his complaint); *Wang v. Palmisano*, 51 F. Supp. 3d 521, 541 (S.D.N.Y. 2014) (dismissing retaliation claim where the plaintiff "alleged the dates on which he filed his complaints" but "merely allege[d]" that the retaliation occurred "'after' he filed his complaints"); *Henry*, 18 F. Supp. 3d at 412 (dismissing retaliation claim where the plaintiff alleged only that the "defendants retaliated

against [her] *when* she complained" or "*after* she complained and/or the conduct became known to others" (alterations and internal quotation marks omitted)).

Because the Amended Complaint "fails to state with even a modicum of specificity when the relevant events occurred," *Henry*, 18 F. Supp. 3d at 412, Plaintiffs' retaliation claims against Shaddock and DOT are dismissed.[16]

### III. Conclusion

For the reasons stated above, Shaddock's Motion is granted in part and denied in part, and DOT's Motion is granted. The Court dismisses Plaintiffs' retaliation claims against Shaddock without prejudice, giving Plaintiffs one last opportunity to plead the timing of the retaliation, but only as to Shaddock.

The Clerk of the Court is respectfully requested to terminate the pending Motions. (Dkt. Nos. 46, 49.)

SO ORDERED.

DATED:     August *11*, 2016
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[16] Even if the Amended Complaint had plausibly pled the requisite causation, *see Vega*, 801 F.3d at 90, DOT would be entitled to dismissal here on the same grounds as with Ward's hostile work environment claim, *see Bethea*, 2014 WL 2616897, at *7–8 (applying *Vance* in the context of a Title VII retaliation claim); *accord Rattigan v. Holder*, 982 F. Supp. 2d 69, 77 (D.D.C. 2013) (analyzing a plaintiff's Title VII retaliation claim under *Vance*), *aff'd*, 780 F.3d 413 (D.C. Cir. 2015).

32